# ON REHEARING EN BANC

## PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PERCY LEVAR WALTON,
　　　　　*Petitioner-Appellant,*

　　　　　v.

GENE M. JOHNSON, Director,
Virginia Department of Corrections,
　　　　　*Respondent-Appellee.*

No. 04-19

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(CA-03-347-7)

Argued: October 27, 2005

Decided: March 9, 2006

Before WILKINS, Chief Judge, and WIDENER, WILKINSON,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, KING, GREGORY, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Judge Widener, Judge Wilkinson, Judge Niemeyer, Judge Lut-
tig, Judge Williams, and Judge Duncan joined. Judge Wilkinson
wrote a separate concurring opinion. Judge Williams wrote a separate
concurring opinion. Chief Judge Wilkins wrote a dissenting opinion,
in which Judge Michael, Judge Motz, Judge Traxler, Judge King, and
Judge Gregory joined.

## COUNSEL

**ARGUED:** Jennifer Leigh Givens, VIRGINIA CAPITAL REPRE-SENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant. Robert Quentin Harris, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** F. Nash Bilisoly, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Appellant. Jerry W. Kilgore, Attorney General of Virginia, Richmond, Virginia, for Appellee.

---

## OPINION

SHEDD, Circuit Judge:

In 1996, Percy Levar Walton murdered three people in Danville, Virginia. Walton pled guilty to the crimes and was sentenced to death in Virginia state court. Over the next several years, Walton directly appealed his conviction and then filed both state and federal habeas petitions, all of which were unsuccessful. In 2003, after the state court scheduled his execution date for the second time, Walton filed his second federal habeas petition wherein he asserted that he is both mentally incompetent and mentally retarded and, therefore, his execution is precluded under *Ford v. Wainwright*, 477 U.S. 399 (1986) (prohibiting the execution of insane inmates), and *Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting the execution of mentally retarded inmates). The district court denied Walton's habeas petition, and we now affirm.

We hold that the district court applied the proper legal standard in deciding that Walton is mentally competent to be executed, and its findings of fact are not clearly erroneous. We further hold that the district court properly dismissed Walton's mental retardation claim because his habeas petition fails to state sufficient facts demonstrating that he is mentally retarded under Virginia law.

### I.

Walton murdered three people, an elderly couple and a younger man, in their homes in two separate incidents during November 1996.

Although the physical evidence alone overwhelmingly established Walton's guilt, Walton also admitted to several other jail inmates that he committed the murders, and he described the graphic details of the murders to his cellmate. We previously recounted the facts of Walton's crimes in greater detail in our opinion deciding Walton's first federal habeas petition. *See Walton v. Angelone*, 321 F.3d 442, 446-49 (4th Cir. 2003).

With the assistance of counsel, Walton pled guilty to all three murders, three counts of robbery, one count of burglary, and six counts of using a firearm in the commission of a felony. Walton indicated that he wanted to plead guilty because the "chair is for killers." *Id.* at 454. After determining that Walton would likely commit additional criminal acts that would constitute a continuing serious threat to society, the Circuit Court for the City of Danville sentenced Walton to death.

Walton then began the long process of challenging his conviction and sentence on both direct and collateral review in state and federal court. Our first federal habeas opinion exhaustively details the extensive procedural history and the claims made in Walton's numerous prior proceedings. *See Id.* at 450-52. In both his state and federal habeas petitions, Walton challenged his conviction and sentence on the ground, among many others, that he was not mentally competent to plead guilty.

After the district court denied Walton relief in his first habeas petition, Walton sought a certificate of appealability from this court. As to Walton's claims that he was not competent to plead guilty and that his counsel was ineffective for failing to adequately raise the issue during the state trial court proceedings, we reviewed the extensive evidence regarding what Walton's counsel knew about Walton's mental condition during the trial court proceedings. *Id.* at 453-57. As we explained, shortly after Walton was indicted, the state court appointed a psychiatrist to assess Walton. Walton told the psychiatrist that he would be able to come back to life shortly after his execution with the same name but a new spirit. Walton also said that he would be able to resurrect his dead family members upon his return. *Id.* at 454 n.12. This psychiatrist opined that Walton was competent to stand trial because Walton understood the proceedings against him and under-

stood that, if convicted of capital murder, he could be executed in the electric chair or by lethal injection. *Id.* at 455-56. The state court appointed a second psychiatrist to assess Walton. The second psychiatrist also opined that Walton was competent because he understood the nature of the proceedings against him and could assist his counsel. *Id.* at 456.

After conferring with these psychiatrists, Walton's trial counsel decided against using a mental incompetence strategy at trial because, among other reasons, the testimony of the two psychiatrists would not have been helpful, Walton had told at least two of his fellow inmates that he intended to "play crazy," and just a few months earlier Walton had stood trial for burglary and grand larceny and his competence to stand trial was not at issue then. *Id.* at 458.

After reviewing this evidence, we denied Walton's certificate of appealability, concluding that "we harbor no doubt" that Walton was competent to plead guilty and that the assistance provided by Walton's counsel was "more than reasonable." *Id.* at 460-61. The United States Supreme Court denied Walton's petition for a writ of certiorari. *Walton v. Johnson*, 539 U.S. 950 (2003).

Thereafter, the Danville Circuit Court rescheduled Walton's execution date for May 28, 2003.[1] Walton chose electrocution as the form of execution. Just three days before this execution date, the district court granted Walton's request for a stay of execution. A panel of this court granted Walton's request to file a second habeas petition to allow him to claim (for the first time in any proceeding) that he cannot be executed because he is mentally retarded. In this second federal petition, Walton makes no further attack on his conviction. Walton's only remaining claims are that he cannot be executed because (1) he is mentally retarded;[2] and (2) he is mentally

---

[1]Walton's first execution date was December 16, 1999. The district court stayed that execution date to allow Walton to file his first federal habeas petition. *Walton*, 321 F.3d at 452.

[2]No Virginia court has passed on Walton's claim that he is mentally retarded. By the time Walton first advanced this claim, he had already completed both his direct appeal and state habeas petition. Virginia's

incompetent.[3]

The district court dismissed Walton's mental retardation claim without an evidentiary hearing, concluding that Walton failed to forecast evidence that his alleged mental retardation originated before the age of 18 — a required element under Virginia law. *Walton v. Johnson*, 269 F. Supp. 2d 692, 700 (W.D. Va. 2003). On the issue of mental competence, however, the district court determined that an evidentiary hearing was warranted. *Id.* at 694.

The district court heard extensive evidence regarding Walton's mental competence during two days of testimony. On the first day, vastly conflicting testimony was presented. Walton's retained experts, Drs. Anand Pandurangi and Reuben Gur, testified that Walton is suffering from schizophrenia and has borderline delusional ideas about his ability to come back to life after his execution.[4] For instance, Walton told Dr. Pandurangi, chairman of the Division of Inpatient Psychiatry at the Medical College of Virginia, that, despite his impending

---

mental retardation statute, which was enacted after the Supreme Court announced its prohibition on the execution of mentally retarded inmates in *Atkins*, provides that habeas petitioners who have already "completed both a direct appeal and a [state] habeas corpus proceeding . . . shall not be entitled to file any further habeas petitions in the [Virginia] Supreme Court and [the petitioner's] sole remedy shall lie in federal court." VA. CODE ANN. 8.01-654.2.

[3]Walton also claimed in his first federal habeas petition that he was incompetent to be executed, but the district court and this court refused to address this issue as premature because there was no pending execution date. *See Walton*, 321 F.2d at 452, 467 n.21; *Walton v. Angelone*, 2002 WL 467142 (W.D. Va. 2002) (unpublished). In this second federal habeas petition, the district court determined, based on *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998), that Walton was not barred from arguing mental incompetence because that petition was not second or successive. *Walton*, 269 F.Supp. 2d at 696.

[4]Walton also called other lay witnesses whose testimony suggested that Walton is not competent. For instance, one of Walton's jailers testified that Walton sometimes talks about an imaginary person in his cell, has strong body odor because he refuses to shower, and does not have a television or radio in his cell to occupy his time.

death sentence, he wanted a motorcycle, a telephone, and to look good at the mall. In their discussion about death, Walton told him that "[p]eople who die go to the graveyard . . . but everybody comes back." J.A. 425. Despite Walton's responses acknowledging that death does occur, Dr. Pandurangi ultimately opined that Walton does not comprehend that he is going to be executed and will die for murdering three people.

When Dr. Gur, the director of neuropsychology at the University of Pennsylvania, asked Walton what death meant, Walton responded, "It means you're dead." J.A. 441. Walton proceeded to explain, however, that after his execution he would "come back as a better person" and would "get a Burger King." J.A. 441. Walton also told Dr. Gur that he had received a letter informing him of his May 28, 2003, execution date: "Yes, I have the letter, and I have an execution date." J.A. 442. Dr. Gur testified that Walton said that execution means dying, but Walton's main concern is that after his death he will come back as a woman. Based on his interviews with Walton, Dr. Gur concluded that although Walton "was able to discuss the method of execution in a seemingly rational fashion, [he] . . . failed to comprehend that at the end of the procedure he will no longer be alive." J.A. 466.

Walton also presented the testimony of Dr. Patricia General, a psychiatrist employed to assess Virginia inmates, who assessed Walton shortly before his scheduled 2003 execution date. Dr. General testified that Walton never exhibited any type of delusional behavior in her presence during their three interviews, but he was confused and largely unable to answer any of her questions during their first session. Dr. General's initial impression was that Walton appeared floridly psychotic, but she did not believe she had a sufficient basis to prescribe him any medication. In their second interview, Dr. General asked Walton why he was going to be put to death. Walton responded that "some people had told him . . . that he had killed some people." J.A. 311-12. After Dr. General's third and last interview with Walton, it was Dr. General's impression that Walton, after receiving an explanation of what execution means, understood that he is going to die because he had been convicted of murder.

Walton also testified on the first day of the evidentiary hearing. He responded to many of the questions — even simple questions — by

repeatedly saying, "I don't know, I don't even know." This was the same response that he had used in varying degrees in interviews with all of the mental health experts who assessed him. Although Walton acknowledged that he had received a death sentence, he waffled in his answers about whether he had been given an execution date. When asked if he knew what would happen to him when he dies, Walton said that he did not know and that the question was "hard." J.A. 508. Walton also denied knowing why the state was going to execute him, and he professed to having no recollection of the elderly couple he murdered. Walton acknowledged that execution by lethal injection involved having a needle stuck into your arm and that "you die," but he denied knowing what would happen in the electric chair. J.A. 523.

Virginia's evidence offered a different view of Walton's mental condition. Shortly before his second scheduled execution date in May 2003, Walton was transferred to Greensville Correctional Center where Virginia's electric chair is located. Allen Glasgow, a rehabilitation counselor at Greensville who conducts intake reviews when condemned inmates arrive at the facility, interviewed Walton when he arrived. Glasgow thought that Walton communicated well during their meeting, and he did not recall Walton ever using the phrase "I don't know. I just don't know" during the entire intake interview. During their interview, Glasgow discussed with Walton several documentary forms: a visitors list, an attorney list, a telephone call list, and a disposition of final remains designation form. Walton filled out the visitors list in his own handwriting with names and addresses from memory. Walton correctly wrote the name of his lawyer on the attorney list, but then indicated that he did not know her address. Glasgow explained that the final remains form was meant for Walton to select a person to dispose of his remains after his execution. Glasgow asked Walton if he understood the final remains form, Walton said that he understood it, and it was Glasgow's impression that Walton did understand it. Walton told Glasgow that he wanted to put his mother's name on the final remains form.

Virginia also presented the testimony of Dr. Alan Arikian, a psychiatrist employed to provide mental health service to Virginia inmates. Dr. Arikian began seeing Walton in 1999, several months before Drs. Pandurangi and Gur began seeing Walton. Unlike Drs. Pandurangi and Gur, who were retained to assess Walton regarding

his claim that he is mentally incompetent, Dr. Arikian initially saw Walton regarding complaints made against him for disruptive behavior on his cellblock. According to Dr. Arikian, Walton exhibited no disturbance of thought or mental illness of any kind when he first saw him. Walton did not use the phrase "I don't know. I don't even know" in their first session. When Dr. Arikian asked Walton about his disruptive behavior, Walton said, "Well, I just enjoy playing around with folks. I enjoy messing with them." J.A. 553. Dr. Arikian met with Walton several more times during the months leading up to his first scheduled execution date in December 1999. In the early sessions, Walton carried on normal conversations with Dr. Arikian. In one conversation, Walton said that old people were expendable and that they should expect to be killed if they tried to keep him from taking their things that he wanted. Walton also said that he thought that "[e]xecution is the same as murder," and he seemed disappointed when Dr. Arikian did not express support for his comment. J.A. 556. Although Walton denied that he was on death-row, Dr. Arikian did not believe Walton's denial because it seemed inconsistent with the rest of their conversation.

As Walton's December 1999 execution date drew near, however, Walton began to use the phrase "I don't know. I just don't know" in his conversations with Dr. Arikian even in response to simple matters. After Walton's December 1999 execution date was stayed, Dr. Arikian did not see Walton again until 2003, shortly before his second scheduled execution date. Although Walton had become more subdued and less inclined to engage in conversation, Dr. Arikian does not believe that Walton is suffering from schizophrenia and instead believes Walton's symptoms are more consistent with a person who has become completely indifferent, who "plays with each of us as the spirit moves him. . . . Some people he will respond to and some he won't." J.A. 578. Dr. Arikian testified that he believes that Walton understands that he will be executed as a result of being convicted of murder. When confronted with the directly opposing views of Drs. Pandurangi and Gur, Dr. Arikian responded: "I think we're at opposite ends of the spectrum on that. . . . I think far from not having an understanding of what's going on, I think [Walton] has a full understanding of what's going on." J.A. 579.

After hearing the divergent testimony regarding Walton's mental competence, the district court decided to appoint a neutral expert to

interview Walton and assess his mental condition. The district court attempted to obtain an expert agreeable to both sides by having each side appoint a psychiatrist who in turn advised the court on suitable neutral candidates. These two psychiatrists ultimately recommended Dr. Mark Mills, a highly qualified forensic psychiatrist, and the district court adopted their recommendation. Virginia later objected to the appointment of Dr. Mills after coming to believe that he could not be neutral because of his personal opposition to the death penalty. Virginia also noted that Walton's counsel had previously retained Dr. Mills in another similar death penalty case. Walton's counsel responded by assuring the district court that Dr. Mills could render objective opinions in Walton's case. The district court overruled Virginia's objection to the appointment of Dr. Mills and requested, based on its interpretation of *Ford v. Wainwright*, that Dr. Mills assess Walton and consider two issues: (1) whether Walton understands that he is to be punished by execution; and (2) whether Walton understands that his punishment is a consequence of his having been convicted of murdering three people.

After Dr. Mills interviewed Walton and submitted his report, the district court held a second evidentiary hearing. At the hearing, Dr. Mills testified that he found Walton to be "odd," of low intelligence but not mentally retarded, and probably suffering from a significant psychiatric disorder, quite possibly schizophrenia.[5] According to Dr. Mills, a person suffering from schizophrenia can, nevertheless, be "competent to stand trial, competent to make a will, [and] competent to be executed." J.A. 916. Notwithstanding Walton's cognitive limitations, Dr. Mills stated that Walton was able to volunteer that he was in prison for murdering three people and that he was sentenced to be executed. Walton correctly informed Dr. Mills that he had selected electrocution for his execution. When Dr. Mills mentioned that many people would consider lethal injection preferable, Walton said that it did not matter because execution was "an end" or "the end." J.A. 899.

---

[5]Dr. Mills did not definitively diagnose Walton's psychiatric disorder because making such a diagnosis was not within the scope of the district court's instruction to him. However, Dr. Mills stated that he did not believe that making a diagnosis was necessary to answer the court's questions, because making such a diagnosis and determining competency are two separate issues that must be assessed differently.

Dr. Mills asked Walton about his religious views and his understanding of death. Walton responded that he believes that he will go to heaven and then come back in some form and be able to see his family. While Dr. Mills believes Walton has a very firm and clear belief in an "afterlife," he does not believe that Walton is a person who is going to prepare for his death. J.A. 925. Even though Dr. Mills found Walton's answers about death to be simple and even childlike, Dr. Mills nevertheless stated that he believes that Walton understands that after his death "things are going to be very different than they are now." J.A. 902. Walton also told Dr. Mills that he prefers to live in prison for the rest of his life rather than be beaten to death. Dr. Mills admitted that he is philosophically opposed to the death penalty and that he would have preferred to find Walton not competent to be executed. Nevertheless, Dr. Mills stated that he "clearly believe[s]" that Walton understands that he is in prison for killing three people and that he will be executed as punishment for these crimes. J.A. 930.

The district court also allowed Walton to call Dr. Pandurangi to testify again because he had reassessed Walton a few days before the second hearing. Dr. Pandurangi's experience with Walton was different from Dr. Mills' experience. Whereas Walton was able to volunteer to Dr. Mills that he was sentenced to be executed for killing three people, Walton told Dr. Pandurangi at the start of their interview that he did not know what the status of his case was. Dr. Pandurangi proceeded to inform Walton that he had pled guilty to killing three people and that he had been given a death sentence. In the next few moments, Walton was able to repeat this information when asked. However, about twenty minutes later, Dr. Pandurangi again asked Walton about his legal status, but this time Walton reverted to saying that he did not know. Although Dr. Pandurangi stated that he does not think that Walton is overtly mentally retarded, he does believe that Walton thinks on the level of a child. When asked whether Walton would prepare for his death, Dr. Pandurangi said that such a question would be difficult for him to answer but that he does not believe that Walton would be able to "wish[ ] people goodbye, turn[ ] off emotional relations, if he has any little belongings, who would get what." J.A. 978. Based on his updated assessment, Dr. Pandurangi testified that he continues to believe that Walton suffers from schizophrenia. However, Dr. Pandurangi agrees with Dr. Mills that diagnosing an inmate with schizophrenia does not necessarily mean that the inmate

is mentally incompetent to be executed. Dr. Pandurangi also admitted that he has very little experience in making the type of competency assessment he was being called on to make in this case.

After both sides rested, the district court allowed final arguments. In addition to arguing other grounds for relief that were stated in Walton's habeas petition, Walton's counsel asserted for the first time that Walton is not competent to be executed because he is "unable to spiritually prepare for his death." J.A. 995.[6]

In a thorough opinion, the district court denied habeas relief on Walton's mental incompetence claim, concluding that "Walton both understands that he is to be executed and that his execution is punishment for his conviction for murder." *Walton v. Johnson*, 306 F. Supp. 2d 598 (W.D. Va. 2004). Walton now appeals.

## II.

We first consider Walton's mental incompetence claim. Walton argues that the district court erred by failing to follow the proper legal standard under *Ford v. Wainwright*. In the alternative, Walton argues that the district court's factual determination that he understands that he has been sentenced to death for murdering three people is clearly erroneous.

## A.

Walton first argues, based primarily on *Ford*, that the district court erred by using an incorrect test to determine his competency to be executed. We find Walton's reliance on *Ford* misplaced.

The petitioner in *Ford* began exhibiting peculiar behavior after being sentenced to death for murder. Ford's lawyers retained mental health experts to assess his mental competence. After interviewing Ford, one expert opined that Ford "had no understanding of why he was being executed [and] made no connection between the homicide

---

[6]Walton did not assert his inability to prepare for passing as a basis to prohibit his execution in his state habeas petition or in either his first or second federal habeas petitions.

of which he had been convicted and the death penalty." *Ford*, 477 U.S. at 403. Based on this expert's opinion, Ford's lawyers sought a reprieve from the death penalty based on Ford's incompetence.

At the time of Ford's appeal — and still today — Florida law prohibited the execution of an inmate if he "does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him." FLA. STAT. ANN. § 922.07(3) (1985 & 2005). The Florida governor, who at that time had sole authority under Florida law to determine whether a death row inmate was competent to be executed,[7] appointed three psychiatrists to assess Ford. After interviewing Ford in the same 30-minute interview, all three state-appointed psychiatrists concluded, consistent with the requirements of the Florida statute, that Ford was able "to understand the nature of the death penalty and the reasons why it was imposed upon him." *Ford*, 477 U.S. at 403-04. Although Ford's lawyers submitted their psychiatrist's report attesting that Ford was incompetent to be executed under the Florida standard, the governor, who had previously publicly announced that he would not consider materials filed in support of a prisoner's suggestion of incompetence, apparently did not accept the report for review. *Id.* at 413, 424. Instead, the governor denied Ford's request for relief without explanation and signed a death warrant. Ford filed a federal habeas petition, but the district court denied the petition without a hearing. *Id.* at 404. After the circuit court affirmed, the Supreme Court granted Ford's petition for certiorari.

In a fractured opinion, the five-member majority — consisting of a four-member plurality and a separate concurrence by Justice Powell — agreed on three matters: (1) the Eighth Amendment forbids the states from executing the insane, *id.* at 409-10, 418; (2) the Florida governor's failure to consider the opinions of Ford's psychiatrist violated his due process rights, *id.* at 413-16, 423-24; and (3) Ford was entitled to an evidentiary hearing in federal district court. *Id.* at 418, 424-25. In sum, the majority concluded that Florida failed to consider adequately all the evidence bearing on the question of whether Ford

---

[7]After *Ford*, the Florida legislature enacted FLA. R. CRIM. P. 3.811, which abrogated the governor's sole authority to determine competence by giving condemned inmates the right to seek a competence determination in Florida state court.

was competent under the Florida legal standard, *i.e.*, whether Ford had "the mental capacity to understand the nature of the death penalty and the reasons why it was imposed on him." *Id.* at 412. The majority, however, did not decide that Florida's legal standard for determining mental incompetence was inadequate. To the contrary, the four-member plurality recognized that Florida's statute properly did not permit the execution of the insane. *Id.* at 408-09 n.2. The plurality's concern was not with Florida's statutory incompetence standard — the same standard used by the district court in Walton's case — but rather was with the district court's failure to consider Ford's evidence demonstrating his alleged insanity. In concurrence, Justice Powell agreed, stating:

> [Ford's] claim of insanity plainly fits within [Florida's statu-tory] *standard*. According to [Ford's] proffered psychiatric examination, [Ford] does not know that he is to be executed, but rather believes that the death penalty has been invali-dated. If this assessment is correct, [Ford] cannot connect his execution to the crime for which he was convicted. Thus, *the question is whether [Ford's] evidence entitles him to a hearing in Federal District Court on his claim.*

*Id.* at 422-23 (emphasis added) (internal citations omitted).

In this case, it is clear that the district court provided Walton all the process he was due under *Ford*. Whereas in *Ford* the petitioner was provided no hearing and the governor and the district court failed to consider Ford's evidence demonstrating his alleged incompetence, the district court in this case heard all the evidence presented by Walton and Virginia. The district court went even further and appointed another expert — one endorsed by Walton — to provide yet another assessment of Walton's mental state. There is no question that the dis-trict court diligently protected the right of Walton to explore fully the issue of his competence to be executed.[8]

---

[8]Walton suggests that the district court improperly limited his counsel to asking the expert witnesses specifically whether Walton understands that he is to be executed for killing three people. Contrary to Walton's suggestion, the district court prevented Walton's counsel only from ask-

Walton, however, argues that the district court erred by not follow-ing the substantive test in *Ford* for determining whether a condemned inmate is competent to be executed. In particular, Walton argues that an inmate is competent to be executed only if he is able to: (1) com-prehend that he is to be executed as punishment for his crime; (2) assist his counsel during the competency proceeding; and (3) prepare for his death in some meaningful manner.[9]

The first component of Walton's proposed competency test is that a condemned inmate must be able to comprehend that he is sentenced to death and the reason why. Virginia asserts that this narrow inquiry constitutes the proper legal test to determine competency for execu-tion, and we agree. Although the *Ford* plurality did not specifically set out to create a Constitutional definition for mental incompetence, the plurality did give several rationales for its primary holding that the Eighth Amendment prohibits the execution of the insane. One of its rationales is that the retributive value of executing a condemned inmate is thwarted if he "has no comprehension of why he has been singled out and stripped of his fundamental right to life." *Id.* at 409. The plurality further stated that it "is no less abhorrent today than it has been for centuries to exact in penance the life of one whose men-tal illness prevents him from comprehending the reasons for the pen-alty or its implications." *Id.* at 417. Justice Powell implicitly adopted this particular rationale in his concurrence when he proposed his test for determining competency: "I would hold that the Eighth Amend-ment forbids the execution only of those who are unaware of the pun-ishment they are about to suffer and why they are to suffer it." *Id.* at 422. Justice Powell's proffered test represents the only ground on

_____

ing Dr. Mills, who also holds a law degree, his impressions of the district court's interpretation of the proper legal standard to determine mental incompetence, a clearly improper line of questioning. The district court otherwise permitted Walton's counsel to question the experts on a wide range of factual topics, including whether they believe Walton is able to prepare for his death.

[9]Unlike Florida, Virginia has no statutory test for determining whether a condemned inmate is competent to be executed, so our review is lim-ited to whether the test used by the district court satisfies the Constitu-tional standard.

which a majority of the Court agreed regarding the standard for determining mental competence to be executed, and we are bound by it. *See Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (stating that when there are multiple rationales given by different justices to support one judgment "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds").[10]

Justice Powell's two-part test to determine competency to be executed has been widely recognized or adopted as the appropriate test for determining mental competence to be executed. The Supreme Court has cited Justice Powell's test with approval, *see Penry v. Lynaugh*, 492 U.S. 302, 333 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), and Congress followed Justice Powell's test in enacting its statutory test for determining competency, *see* 18 U.S.C. § 3596 (c) ("A sentence of death shall not be

---

[10]A statement by Justice Powell in *Ford* and another statement by Justice Marshall in a subsequent case suggest that *Ford* does not actually establish a substantive test for determining incompetence. In his concurrence, Justice Powell specifically stated that the "Court's opinion does *not* address . . . the meaning of insanity" in the context of being competent to be executed. *Ford*, 477 U.S. at 418 (emphasis added). In a subsequent opinion dissenting from the denial of a petition for a writ of certiorari, Justice Marshall, the author of the *Ford* plurality opinion, asserted that the *Ford* Court did *not* establish the test for competence to be executed. *Rector v. Bryant*, 501 U.S. 1239, 1241 (1991). Despite these comments, however, the actual discussion of rationales and the overlapping agreement on one of the rationales in both the *Ford* plurality opinion and Justice Powell's concurrence and also the Supreme Court's subsequent acknowledgment of Justice Powell's proffered test (albeit in dicta) as the appropriate standard, *see Penry v. Lynaugh*, 492 U.S. 302, 333 (1989) ("[U]nder *Ford v. Wainwright* . . . someone who is 'unaware of the punishment they are about to suffer and why they are to suffer it' cannot be executed"), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), convince us that the *Ford* Court effectively adopted Justice Powell's proffered two-part test as the Constitutionally minimum standard for determining mental competence to be executed. *See United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (stating that the circuit court can be bound by Supreme Court dicta almost as firmly as Supreme Court holdings).

carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person"). In addition, all four federal circuit courts that have addressed competency to be executed have recognized Justice Powell's proffered test as the appropriate standard by which to determine competence. *See, e.g.*, *Scott v. Mitchell*, 250 F.3d 1011, 1014 (6th Cir. 2001) (concluding that the standard established in "Ohio's *Ford* statute," *i.e.*, "that the convict in question does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict," appropriately defines incompetence to be executed); *Massie v. Woodford*, 244 F.3d 1192, 1195 n.1 (9th Cir. 2001) (citing *Ford* for the proposition that "the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it"); *Fearance v. Scott*, 56 F.3d 633, 640 (5th Cir. 1995) (recognizing that the *Ford* standard requires only that an inmate "know the fact of his impending execution and the reason for it"); *Rector v. Clark*, 923 F.2d 570, 572 (8th Cir. 1991) (stating that "according to *Ford*, we must examine two factors in assessing petitioner's competency to be executed: (1) whether petitioner understands that he is to be punished by execution; and (2) whether petitioner understands why he is being punished"). Moreover, most states that have a statutory definition of competency for execution use Justice Powell's two-part test.[11] Last,

---

[11]*See, e.g*, ARIZ. REV. STAT. § 13-4021(B) (2005) ("'[M]entally incompetent to be executed' means that due to a mental disease or defect a person who is sentenced to death is presently unaware that he is to be punished for the crime of murder or that he is unaware that the impending punishment for that crime is death."); GA. CODE ANN. § 17-10-60 (2005) ("As used in this article, the term 'mentally incompetent to be executed' means that because of a mental condition the person is presently unable to know why he or she is being punished and understand the nature of the punishment"); LA. REV. STAT. ANN. § 15:567.1 (b) (2005) ("A person is not competent to proceed to execution when a defendant presently lacks the competence to understand that he is to be executed, and the reason he is to suffer that penalty"); OHIO REV. CODE ANN. § 2949.28(A) (2005) (stating that "'insane' means that the convict in question does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict"); UTAH CODE ANN. § 77-19-201 (2005) (stating that "'incompetent to be executed' means that, due to mental condition, an inmate is unaware of either the

although the dissent asserts that the district court's findings of fact are not sufficient, it also agrees that Justice Powell's test is the appropriate competency standard. Dissent, *infra* at p. 35 ("I agree that the test for competency under the Eighth Amendment is whether an individual understands that he is to be executed and why").

Walton next argues that an inmate must be able to assist in his defense throughout the competency determination process. Walton's counsel candidly and correctly conceded at oral argument that only four members of the *Ford* Court would have required that an inmate be able to assist his counsel to be deemed competent for execution. The plurality would have added this requirement based on the common-law premise that "had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." *Ford*, 477 U.S. at 407. Justice Powell found only slight merit for such a requirement because "[m]odern practice provides far more extensive review of convictions and sentences than did the common law, including not only direct appeal but ordinarily both state and federal collateral review. . . . It is thus unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free." *Id.* at 420.

The procedural history of Walton's numerous challenges to his sentence and conviction provides a good example of the exhaustive modern safeguards and procedures available to condemned inmates. Since 1997, Walton has pursued several rounds of direct and collateral review — always represented by counsel — in both state and federal court to test the validity of his conviction and sentence. All of these challenges failed, and Walton, now in his second federal habeas proceeding, makes no further attack on his sentence or conviction. The only remaining issue is whether Walton is competent to be exe-

---

punishment he is about to suffer or why he is to suffer it"); WYO. STAT. ANN. § 7-13-901(a)(V) (Michie 2005) (stating that "'requisite mental capacity' means the ability to understand the nature of the death penalty and the reasons it was imposed"). Other states have adopted Justice Powell's two-part test by case law. *See, e.g.*, *Baird v. State*, 833 N.E.2d 28, 30 (Ind. 2005), *cert. denied*, 74 U.S.L.W. 3211 (Oct. 3, 2005); *Van Tran v. State*, 6 S.W.3d 257, 266 (Tenn. 1999).

cuted, and we conclude that there is no Constitutional requirement[12] under *Ford* that Walton be able to assist counsel to be deemed competent to be executed.[13]

Last, Walton proposes that competency for execution requires that a condemned inmate have the capacity to prepare himself mentally and spiritually for his passing to "another world." Walton's Brief p. 32. We conclude that *Ford* mandates no such requirement. Justice Powell — who provided the fifth vote in *Ford* — did not require that an inmate have the capacity to prepare mentally and spiritually for his passing in his two-part test. To the contrary, Justice Powell clearly stated that "I would *hold* that the Eighth Amendment forbids the execution *only* of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Ford*, 477 U.S. at 422 (emphasis added).[14] Therefore, we conclude that the Eighth Amend-

---

[12]Some states specifically require (in addition to Justice Powell's test) that an inmate be able to assist counsel to be deemed competent to be executed. *See, e.g.*, Miss. Code Ann. § 99-19-57(2)(b) (2005); N.C. Gen. Stat. § 15A-1001(a) (2005); *Singleton v. State*, 437 S.E.2d 53, 58 (S.C. 1993); *State v. Harris*, 789 P.2d 60, 66 (Wash. 1990). The fact that some states have deemed it appropriate to provide greater protections than the federal Constitutional minimum is perfectly consistent with federalism principles. Virginia is not, however, one of the states that require an inmate be able to assist counsel to be deemed competent to be executed.

[13]At least one other circuit court has specifically rejected this requirement. *See Coe v. Bell*, 209 F.3d 815, 826 (6th Cir. 2000) ("We agree that a prisoner's ability to assist in his defense is not a necessary element to a determination of competency to be executed").

[14]In support of his argument, Walton primarily focuses on Justice Powell's statement that "only if the defendant is aware that his death is approaching can he prepare himself for his passing." *Ford*, 477 U.S. at 422. Read in its context, it is clear that Justice Powell did not include this as a required element of his test. Justice Powell made his two-part test explicitly clear ("I would hold") and excluded any mention of requiring that a condemned inmate be capable of preparing for his passing. In other words, while preparing for passing might well be a salutary result of satisfying Justice Powell's test, it is not a required element of the test. Justice Powell noted that "most" people would value the "opportunity" to prepare for their passing, but he also stated that the Florida statutory standard, which requires only that the inmate have the "mental capacity to understand the nature of the death penalty and why it was imposed" on him, "appropriately defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition." *Ford*, 477 U.S. at 421-22.

ment does not require that an inmate have the capacity to prepare for his passing to be deemed competent to be executed.

In determining whether Walton is competent to be executed, the district court specifically examined whether Walton understands that he is to be punished by execution and whether he understands why he is to be punished. *Walton*, 306 F. Supp. 2d at 601. Because the district court faithfully followed Justice Powell's two-part test, we conclude that the district court employed the proper legal test in making its competency determination.

### B.

Walton also argues that, even applying the Powell two-part test, the district court clearly erred in finding him competent to be executed. Walton contends that the evidence overwhelmingly demonstrates his incompetence. We disagree.

We review factual findings by the district court under the clearly erroneous standard set forth in Federal Rule of Civil Procedure 52(a). *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003); *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1297 n.18 (4th Cir. 1992). Our scope of review is narrow; we do not exercise de novo review of factual findings or substitute our version of the facts for that found by the district court. *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995).[15] Instead, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the

---

[15]The dissent states that it is undisputed that "Walton has fallen deeper and deeper into mental illness." Dissent, *infra* at p. 35. This comment has no real legal significance. Whether Walton is mentally ill is not the relevant question before us. As both Drs. Pandurangi and Mills stated, whether an inmate is mentally ill is a different concept from whether an inmate is mentally incompetent to be executed. Moreover, we are obliged to consider only the evidence of Walton's mental condition that the district court considered. At oral argument, Walton's counsel stated that, assuming he loses his current challenge, Walton would not be precluded from later contesting his execution if he demonstrates that his condition has deteriorated. The issue of whether such a challenge would be allowed is not before us, and we do not address it.

court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). Thus, facts found by the district court are conclusive on appeal "unless they are plainly wrong." *Jiminez*, 57 F.3d at 378-79. A factual finding by the district court may be reversed only if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum* Co., 333 U.S. 364, 395 (1948).

The parties presented vastly conflicting evidence whether Walton understands that his execution will result in his death. After considering all of the evidence submitted by the parties, the district court sought yet another professional opinion by appointing a neutral expert, Dr. Mills, who Walton strongly endorsed as an objective expert. When Dr. Mills met with Walton, Walton was able to volunteer that he was going to be executed for killing three people and that his execution would be "an end" or "the end." J.A. 899. When Dr. Mills asked Walton about his religious views and his understanding of death, Walton said that he believes that he will go to heaven and then come back in some form and be able to see his family. Dr. Mills believes Walton has a very firm and clear belief in an "afterlife," but that Walton would prefer to live in prison for the rest of his life rather than be killed. J. A. 925. In sum, Dr. Mills, who is personally opposed to the death penalty and would have preferred to find Walton incompetent, stated that he clearly believes that Walton understands that he is in prison for killing three people and that he will be executed as punishment for these crimes.

Other evidence presented by Virginia confirms Dr. Mills' ultimate opinion that Walton is competent to be executed. For instance, Virginia presented the testimony of Dr. Arikian, a psychiatrist who has assessed hundreds of prisoners during his career and who saw Walton several times more than any of the other experts who testified. Dr. Arikian stated that he believes that Walton understands that he is going to be executed for his crimes. When confronted with the opposing view of Dr. Pandurangi, who admittedly has had very little experience with prisoners, Dr. Arikian replied: "I think we're at opposite ends of the spectrum on that. . . . I think far from not having an under-

standing of what's going on, I think [Walton] has a full understanding of what's going on." J.A. 579.

After reviewing the evidence in its entirety and the district court's findings of fact, we are far from being left with the "definite and firm conviction that a mistake has been committed." *United States Gypsum Co.*, 333 U.S. at 395. To the contrary, the district court considered the divergent evidence presented by both sides and the neutral testimony of Dr. Mills,[16] and there is substantial evidence in the record to support the district court's finding that "Walton understands that he is in prison and has received an execution sentence for murdering three individuals [and that] Walton understands that to be executed means he will die." *Walton*, 306 F. Supp. 2d at 600.

Even though the district court — after thoroughly considering the evidence — specifically found that Walton understands that he will die as punishment for his crimes, the dissent insists that the *Ford* test requires more. In particular, the dissent would create a new "requirement" that the district court must also specifically determine whether the condemned inmate "understand[s] that to be executed means to have one's physical life ended." Dissent, *infra* at p. 39. In an attempt to add legitimacy to this new "requirement," the dissent asserts that other courts have required "precisely" such a specific finding. *Id.* at 38-39. Contrary to the dissent's contention, none of the cases it cites (or any case that we have found) supports the dissent's new "requirement" that a court determining competency for execution must specifically decide whether the condemned inmate understands that to be

---

[16]The dissent states that "Dr. Mills' assessment of Walton's competency does not present the unequivocal certainty that the majority opinion claims for it." Dissent, *infra* at p. 46. Contrary to the dissent's characterization, we do not suggest — nor do we need to — that Dr. Mills' testimony is unequivocal. This statement by the dissent is either irrelevant or reflects a misunderstanding of our standard of review. As a reviewing court, we are required to determine if there is sufficient evidence to support the district court's findings of fact. While we do not suggest that Dr. Mills' testimony presents "unequivocal certainty," Dr. Mills' firm opinion that Walton is competent, along with the other testimony presented by Virginia, provides more than ample support for the district court's finding that Walton understands that he is going to be executed and will die as punishment for his crimes.

"executed means to have one's physical life ended."[17] Instead, these cases stand for the unremarkable proposition, which we have adopted, that the condemned inmate must understand that he will die as punishment for his crimes.[18] In this case, the district court, faced with

---

[17]Even applying the substantive requirement of the dissent's new test — that the condemned inmate must understand that death "means the end of one's physical life" — the record contains ample evidence, as the dissent correctly concedes, establishing that Walton understands that his execution will mean the end of his physical life. Walton told Dr. Pandurangi that "[p]eople who die go to the graveyard." J.A. 425. Walton told Glasgow that he wanted his mother to be responsible for disposing of his remains after his execution. Walton told Dr. Mills that he prefers electrocution for his execution, which is consistent with Walton's statement at the time of his sentencing that "the chair is for killers." Walton also told Dr. Mills he would prefer to live the rest of life in prison rather than be killed. Dr. Mills interpreted Walton's comment to mean that, in considering the alternatives between life and death, Walton "would like to live." J.A. 909. When Dr. Mills specifically asked Walton if he knew that he might well be scheduled to die, Walton replied, "Yes." J.A. 910. When Dr. Mills asked Walton what he wanted for his last meal, Walton showed no confusion about what Dr. Mills meant by the question and answered quickly and clearly.

[18]In fact, in many of the cases cited by the dissent, the reviewing court — like the majority does in this case — upholds the finding by the lower court over contested facts that the condemned inmate understood that he would die as punishment for his crimes. *See, e.g.*, *Billiot v. State*, 655 So.2d 1, 8 (Miss. 1995) (affirming the lower court's finding that the condemned inmate was competent to be executed even though one expert testified that the inmate "does not have a rational understanding of the proceedings; . . . rationally he can't connect what he was tried for and . . . the penalty and his actions. He can't relate those. And he . . . believes that he will never be executed"); *Barnard v. Collins*, 13 F.3d 871, 877 (5th Cir. 1994) (denying habeas relief based on the state court's finding that the condemned inmate "knew that he was going to be executed and why he was going to be executed — *precisely* the finding required by the *Ford* standard of competency") (emphasis added). Moreover, our holding is consistent with *Garrett v. Collins*, 951 F.2d 57 (5th Cir. 1992). In that case, Garrett did not believe that his execution would result in his death because he thought that his dead aunt would protect him from the harmful effects of the lethal injection. *Id.* at 58-59. Garrett did understand, however, that it was possible for him to die when the needle is stuck into his arm. *Id.* at 59. Although Garrett argued that he was not competent to be executed under *Ford*, the Fifth Circuit found that Garrett met the *Ford* test because he understood the nature of the death penalty and its implications. *Id.* at 59.

vastly conflicting evidence, found by a preponderance of the evidence that "Walton understands that he is sentenced *to die* by execution" for his crimes and, even more precisely, that Walton "understands that to be executed means that *he will die*." *Walton*, 306 F. Supp. 2d at 600-01 (emphasis added). *Ford* does not require more.

In asserting that Walton may not understand that his execution will end his physical life, the dissent points primarily to the comments that Walton has made about being able to "come back to life after execution." Dissent, *infra* at p. 43. While many of Walton's beliefs about the "afterlife" might strike others as odd or unrealistic, they are not inconsistent with the district court's finding that "Walton understands that to be executed means he will die." *Walton*, 306 F. Supp. 2d at 600.[19] Moreover, some of Walton's recent statements of what he believes will happen after his death are no more unrealistic than the statements Walton made to his psychiatrist and attorney during the state trial proceedings. During his recent interview in 2004, Walton told Dr. Mills that he believed that he would go to heaven but would return and be able to see his relatives. During the state trial proceedings in 1997, Walton stated that he would come back to life shortly after his execution and would be able to resurrect his dead relatives. A panel of this court, after considering Walton's 1997 statement, nevertheless ruled in Walton's first federal habeas proceeding that "we harbor no doubt that Walton was competent to appear in court and plead guilty." *Walton*, 321 F.3d at 460. Because the standard for competency to plead guilty, which, similar to the standard for competency to be executed, requires that the defendant understand, among other things, the "consequences of the proceedings against him," *see*, 18 U.S.C. § 4241; *Godinez v. Moran*, 509 U.S. 389, 396 (1993), Walton's recent comments about his "afterlife" clearly do not suggest incompetence any more than his similar comments did during his first federal habeas proceeding.

In sum, we conclude that the district court employed the proper legal test and its findings of fact are not "plainly wrong," *see Jiminez*,

---

[19]That a person believes that he will have an "afterlife," however strange his views of that "afterlife" may be, necessarily suggests he believes his existing life will end.

57 F.3d at 379. Thus, we affirm the district court's judgment that Walton is competent to be executed.

III.

Walton also argues that the district court erred by dismissing his claim that he cannot be executed because he is mentally retarded as defined under Virginia law. We disagree.

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment prohibits the execution of the mentally retarded, concluding that "death is not a suitable punishment for a mentally retarded criminal." 536 U.S. at 321. The Court, however, left to the states the task of developing appropriate procedures to determine whether an inmate who claims to be mentally retarded is in fact mentally retarded. *Id.* at 317. Virginia responded by enacting its statutory definition of mental retardation that requires, among other elements, that the condemned inmate's disability originate before the age of 18 and be characterized by "significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean." VA. CODE ANN. § 19.2-264.3:1.1(A)(I). The Virginia Supreme Court, consistent with the standards of the American Psychiatric Association, has determined that this standardized measure corresponds to an IQ score of 70 or less. *Johnson v. Commonwealth*, 591 S.E.2d 47, 59 (Va. 2004), *vacated on other grounds*, No. 03-10877, 2005 WL 516756 (U.S. Mar. 7, 2005); *see also*, *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005) ("On a properly normed IQ test only scores of 70 or lower are two standard deviations below the mean"). Thus, Walton can be deemed mentally retarded under Virginia law only if he establishes, among other requirements, that his intellectual functioning would have corresponded to an IQ score of 70 or less before he turned 18. *See Walker*, 399 F.3d at 320.[20]

---

[20]This does not mean that a condemned inmate must submit a score of 70 or less from an IQ test taken before he turned 18. *Walker*, 399 F.3d at 323 n.7 (4th Cir. 2005). Nevertheless, there must be some competent allegation that the inmate's intellectual functioning would have fallen below this standard before he turned 18. *See* VA. CODE ANN. § 19.2-264.3:1.1(A),(B)(3).

The district court dismissed Walton's mental retardation claim, concluding that "Walton has not satisfied the statutory definition of mental retardation under Virginia law." *Walton*, 269 F. Supp. 2d at 700-01. Because the district court disposed of Walton's mental retardation claim by granting the state's motion to dismiss, our review is de novo. *Walker*, 399 F.3d at 319. In determining whether Walton has properly stated a claim for relief in his petition, we must decide whether Walton "has set forth facts that, if true, would demonstrate that he is mentally retarded under Virginia law." *Id.* at 320.

A review of Walton's habeas petition reveals that he fails to allege facts demonstrating that he is mentally retarded under Virginia law.[21] Walton alleges that he scored 90 on an IQ test in 1996, shortly before he turned 18. Although Walton claims that "[l]ittle is known" about how this testing was conducted and whether it can be considered reliable, he does not allege that this testing somehow tends to prove that he is mentally retarded, *i.e*, that his score on this test was actually 70 or less. Walton also alleges that he received an IQ score of 77 when his trial expert tested him a few months after he turned 18. Walton contends, however, that this score of 77 should be reduced to a score of 74 because of the "Flynn Effect."[22] Accepting these allegations in

---

[21]Both Drs. Pandurangi and Gur began seeing Walton shortly before his first execution date in December 1999. Although these experts were retained before the Supreme Court announced the categorical ban on executing mentally retarded inmates in *Atkins*, whether Walton is mentally retarded was a factor that could have been considered under Virginia law in a capital murder case even before the categorical ban on the execution of mentally retarded condemned inmates was established by the Supreme Court in *Atkins. See Atkins v. Commonwealth*, 534 S.E.2d 312, 320 (Va. 2000), *rev'd on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002); *Washington v. Commonwealth*, 323 S.E.2d 577, 586-87 (Va. 1984); *see also Penry v. Lynaugh*, 492 U.S. 302, 337-38 (1989) ("[T]he sentencing body must be allowed to consider mental retardation as a mitigating circumstance in making the individualized determination whether death is the appropriate punishment in a particular case"), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). Nevertheless, Drs. Pandurangi and Gur have never opined that Walton is mentally retarded.

[22]The premise of the "Flynn Effect" is that IQ scores increase over time and that IQ tests that are not re-normed to take into account rising IQ levels will overstate a testtaker's IQ score. *Walker*, 399 F.3d at 322. Walton actually alleged in his petition that his score after being adjusted for the "Flynn Effect" would be as low as 72 (not 74 as he now alleges), but he has now abandoned that position.

Walton's habeas petition as true, Walton still does not state a claim that he is mentally retarded because Virginia law requires that intellectual functioning be commensurate with a score of 70 or less before age 18.[23]

After Virginia filed its motion to dismiss Walton's habeas petition, Walton alleged for the first time in a separate filing that his test score of 77 supports his claim of mental retardation once the Flynn Effect and the "standard error of measurement" is taken into account. Assuming that the district court could properly consider this post-petition representation, Walton does not explain what this "standard error of measurement" is or why it should reduce his particular score to 70 or less. Walton can only speculate that this standard measurement error (which a mental health expert can take into account to either *raise or lower* a given IQ test score by as much as five points, *see id.* at 322) actually *lowered* his given score of 77 enough to meet Virginia's mental retardation standard.[24] Such conclusory, speculative allegations do not preclude the district court's dismissal of Walton's claim. *See United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004)

---

[23]Walton also alleges that he was tested two other times several years after he turned 18 and that both test results are below 70. Although these test results are relevant to Walton's more recent intellectual functioning, *see Walker*, 399 F.3d at 323 n.7, Walton does not allege that these scores demonstrate that his intellectual functioning would have been commensurate with a score of 70 or less before he turned 18.

[24]Although Walton attached to his second habeas petition expert affidavits and other documents supporting his mental *incompetence* claim, as he was clearly allowed to do under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts (2003), Walton failed to attach any materials from his experts supporting his mental *retardation* claim. Although not necessary for our ruling, we note that the only expert evidence in the record directly contradicts the current speculative assertion by Walton that he is mentally retarded. For instance, Walton's trial expert testified that Walton's test score of 77 "most likely is an *underestimate* of his intelligence" and that Walton is "certainly not retarded." J.A. 192 (emphasis added). In addition, Dr. Mills testified that Walton is not mentally retarded and that he would estimate Walton's IQ at around 80. Also, although Dr. General initially thought that Walton appeared to be mentally retarded, she later opined that Walton is not mentally retarded.

(concluding that speculative allegations in a habeas petition do not warrant granting the petitioner an evidentiary hearing to further pursue his claim); *Fisher v. United States*, 317 F.2d 352, 354 (4th Cir. 1963) (stating that "bald assertions of insanity, unsubstantiated by a recital of credible facts, would justify dismissal without further proceedings"). Accordingly, because Walton failed to allege sufficient facts demonstrating that his intellectual functioning was 70 or less before he turned 18, the district court properly dismissed Walton's mental retardation claim.

## IV.

For the reasons stated above, we conclude that there is substantial evidence supporting the district court's finding that Walton is not mentally incompetent, and we also determine that Walton has failed to sufficiently state a claim that he is mentally retarded under Virginia law. Therefore, we affirm the judgment of the district court.

*AFFIRMED*

WILKINSON, Circuit Judge, concurring:

"[T]he Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Ford v. Wainwright*, 477 U.S. 399, 422 (1986) (Powell, J., concurring in part and concurring in the judgment). Judges called upon to interpret the Eighth Amendment may not engage in metaphysical inquiries under the guise of constitutional interpretation, but neither may they abdicate their responsibility to provide content to an express constitutional guarantee.

The Powell test appreciates that the Constitution does not countenance judicial forays into inherently philosophical arenas. Nowhere does the Eighth Amendment mandate that a defendant understand the end of life in a particular way before he may be executed. The amendment provides no definition of death, and it certainly does not license judges to discover one. That task is well beyond our competence and authority, and is best left to religious leaders, scientists, philosophers, and the private recesses of individual belief. The multiplicity of views

on this most sensitive and intimate of subjects all but guarantees that any definition of death — even one as seemingly generic as "the end of physical life" — will fail to respect the views of many who may not see death in this way.

At the same time, Justice Powell's test recognizes that the Eighth Amendment must provide a meaningful independent check on the coercive exercise of state power. This cannot occur if competency is simply a rote formality devoid of any actual insight into a defendant's mental capacity. The mere ability to recite magic words such as "death" and "punishment," for example, is insufficient by itself to demonstrate comprehension of the significant sanction to be imposed.

The question is how to avoid a subjective and non-inclusive definition of death, without allowing competency to become a meaningless concept. Justice Powell sought to resolve this tension by requiring under the Eighth Amendment an objective, individualized inquiry into a particular defendant's mental competence. That is precisely what took place here. As the majority recognizes, the district court was in the best position to evaluate Walton's mental state, and it applied the Powell test in an exceedingly careful and thorough fashion. It conducted two evidentiary hearings, heard testimony from Walton himself as well as multiple witnesses for each side who had interviewed him, and took the additional step of commissioning a psychiatric examination of its own. Judge Shedd's majority opinion reflects in its own conscientious fashion the care taken in this weighty matter by the trial court, and I concur in it in full.

WILLIAMS, Circuit Judge, concurring:

I concur fully in the majority's opinion. I write separately, and with all due respect to my good colleagues in dissent, to explain why I believe the dissent's proposed test for determining sanity to be executed is flawed. The dissent would hold that "the Constitution, as a legal matter, requires that a condemned inmate understand that execution will result in the end of his physical life." *Post* at 35. Application of this test would prevent Virginia from executing Walton — whom the district court has found understands that he is going to be executed, why he is going to be executed, and that his execution will cause him to die, *see Walton v. Johnson*, 306 F.Supp.2d 597, 600

(W.D. Va. 2004) — unless the district court also finds that Walton "understand[s] that his execution will [cause] the end of his physical life." *Post* at 33. In my view, this additional test suffers from two significant deficiencies.

First, neither Justice Powell's formulation of the legal test in *Ford v. Wainwright*, 477 U.S. 399 (1986), nor the Court's adoption of that test (albeit in dicta) in *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), required that a death-row inmate understand death to mean "the end of his physical life." Rather, these cases required, as has the majority in this case, that the condemned inmate be "[ ]aware of the punishment [he is] about to suffer and why [he is] to suffer it." *Ford*, 477 U.S. at 422 (Powell, J., concurring in part and concurring in the judgment); *Penry*, 492 U.S. at 333. Rather than apply existing Supreme Court precedent, the dissent rewrites that precedent. And to the extent the dissent argues that its test should be seen as an interpretation of *Ford* and not its rewriting, *post* at 34, the interpretation is without basis. None of the cases the dissent cites in support of its test, *post* at 36-38, purports to define "death," much less to define it as "the end of [one's] physical life." Instead, each of those cases states (or implies) only that the defendant must understand the "nature" of the death penalty and that the "nature" of the death penalty is that it causes death. Not one of the cases "examined *precisely* . . . whether the inmate must understand that the execution will mean the end of his physical life," *post* at 38: Not one of the dissent's quotes from those cases contain any language to that effect. A test that has not appeared in any statute or case law in the 20 years since *Ford* was decided can hardly be as "obvious" as the dissent claims. *Post* at 39.

Moreover, deviation from Justice Powell's formulation is doubly inappropriate in the Eighth Amendment context — an area of law that "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society" as primarily evidenced by "the legislation enacted by the country's legislatures." *Atkins*, 536 U.S. at 311-12 (internal quotation marks omitted). Despite the state-centric focus of the Eighth Amendment, the dissent's test is unsupported by any statutory analogue. It is true, as the dissent asserts, that in addition to seeking guidance from state law, "federal courts must render their own judgment regarding constitutional limitations on exe-

cution." *Post* at 39. But by relying on its own judgment, the dissent reveals that, ultimately, its test is its own — and not *Ford*'s — creation.

Second, even if we were deciding this case on a clean slate, the dissent's test both (1) fails to account for the fact that many understand death on non-scientific terms and (2) requires courts to evaluate the meaning of such non-scientific understandings. As noted, the dissent would hold that to be sane, a person must understand his death in purely scientific terms: "the end of [one's] physical life." In my view, this definition fails to account for the fact that, depending on the orientation of one's *Weltanschauung*, a perfectly sane person can understand death — not just the afterlife, but death itself — in terms that are wholly religious, poetic, or metaphysical (or some combination thereof), and that do not involve a scientific underpinning at all. To give just one of the likely innumerable examples, think of the Solipsist, who, after many years of academic study, comes to believe that all things, including his own body, are merely illusions posited by his eternal mind. Does he view death on the dissent's scientific terms? If not, is he therefore insane? I cannot subscribe to the view that a condemned inmate is insane simply because he does not view death through the dissent's scientific lens. Indeed, given the many diverse visions of death, the abstract nature of the inquiry, and the state-centric nature of the Eighth Amendment, *see Atkins*, 536 U.S. at 311-12, I do not believe that we federal judges (not to mention we inferior-court judges) should be the ones deciding whether a condemned inmate who understands that he is going to die must understand more about his death in order to be sane. *Cf. Atkins*, 536 U.S. at 317 ("To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . [Therefore,] we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." (internal quotation marks omitted)).[1]

---

[1]To be clear, I do not suggest that we federal judges are not well-suited to provide a definition of "death" in all areas of law. Rather, I suggest that we are not well-suited to define, for Eighth Amendment purposes, what every condemned inmate who is aware of the penalty he is about

The dissent attempts to buttress its test by claiming its focus on what happens to the inmate's "physical" life at death is justifiable because "[e]xecution is a punishment wrought [solely] upon the body." *Post* at 40. The dissent fails to realize, however, that this statement is itself a metaphysical one. Execution is a punishment inflicted on the "body" alone only insofar as one sees a human being as comprised of "body" and something else, such as "soul" or "mind." But take out the dualism, and it could just as easily be said that execution is a punishment of the "person." My goal here, of course, is not to debate metaphysics, but to demonstrate that the dissent's narrow view of what it means to die fails to do justice to those who do not view themselves, the world in which they live, or the implications their ultimate fate in precisely the same manner as my colleagues in dissent.

In addition to its failure to account for the fact that many do not understand death on scientific terms, the dissent's test requires an inquiry into condemned inmates' religious, poetic, or metaphysical views of death and the afterlife. Does a Christian who recites the Apostles' Creed, with its claim to the "resurrection of the body," see death as the *end* of his physical life? What of Thornton Wilder, whose Emily in *Our Town* is given the opportunity to relive her twelfth birthday despite her death? What of a member of any number of Eastern religions, whose belief in reincarnation presupposes that although death is the end of *this* physical life, it is not the end of *his* physical life? And what of the Solipsist, whose views presuppose that he does not even have a *physical* life? A test that could base a finding of insanity on such views seems far afield from the Eighth Amendment's prohibition of the execution of the insane.

The dissent suggests that "[i]t should be crystal clear that this case is *not* about the orientation of Walton's *Weltanshauung* [and that it] is *not* about [Walton's] religious or philosophical views about the

---

to suffer precisely must understand about his impending death in order to be sane. These are different arguments entirely: the first pertains to the running of a well-oiled legal system that must account for the fact that people stop living, while the second pertains to matters on which we have no special authority or insight.

afterlife." *Post* at 40. As for the dissent's first point, I could not agree more. Unless, however, my dissenting colleagues believe that their legal test should apply only in Walton's case, this point affords the dissent no purchase. If a legal test founders in a hypothetical case that could come before the court — as the dissent's would in the case of a condemned inmate who did not understand his death in scientific terms — this fact, in my view, is a good reason to reject the test.

As for the dissent's second point, I agree that this case *should not* be about Walton's views about the afterlife. Unfortunately, however, it is the dissent's test that requires examination of such matters. Why else would the dissent ground its ultimate conclusion that remand is warranted on the facts that Walton believed that: (1) "he could *come back to life* and be with his honeys," *post* at 43 (emphasis added and internal quotation marks omitted), (2) "electrocution is . . . going to make him . . . *come back to life* or something stronger," *post* at 43 (emphasis added and internal quotation marks omitted); (3) "he might have special powers that would allow him to *come back to life* after execution," *post* at 43 (emphasis added and internal quotation marks omitted); (4) he might "*come back* as a woman," *post* at 45 (emphasis added and internal quotation marks omitted); and (5) "[death means that you s]leep *for [the] rest of [your] life . . . until someone comes to see you*," *post* at 43 (emphasis added and internal quotation marks omitted). The dissent's actual analysis is more revealing than what it asserts this case is or is not about.[2]

To be sure, I share the instinct that undergirds the dissent's search for a vision of death that everyone must hold in order to be considered sane: to understand the meaning of a word, a person must be capable of understanding the concept to which that word refers. To understand

---

[2]The dissent suggests that it does not rely on Walton's views of the afterlife as "evidence of Walton's religious or metaphysical [beliefs]" but rather as "evidence that Walton may view death as merely a brief interruption of his current physical life," and that it would remand for the district court to make the factual determination of whether Walton's views reveal the former or the latter. *Post* at 41. This suggestion, however, simply demonstrates my point — the dissent's test would require the district courts to make these very types of sensitive value judgments regarding a condemned inmate's views of the afterlife in the first place.

the meaning of the word "chair," for example, a person must be capable of understanding the concept of "an object used for sitting" (or something similar). Likewise, to understand the meaning of the words "execution" or "die" a defendant must be capable of understanding the concepts to which those words refer. But the fact that I share this instinct does not lead me to believe either that we should be deciding the particular content of these abstract and contentious concepts or that the dissent's test accurately captures them. Applying *Ford*, then, I conclude that the district court's findings that Walton knows that he is going to be "executed" and that his execution will cause him to "die" — findings that necessarily indicate Walton was capable of understanding the concepts to which these words refer — satisfied the requirement that Walton be "[ ]aware of the punishment he is about to suffer." 477 U.S. at 422 (Powell, J., concurring in part and concurring in the judgment). As the majority has ably demonstrated, the evidence in the record, and the expert testimony in particular, supports such a finding, and I cannot hold that the Eighth Amendment requires more.

WILKINS, Chief Judge, dissenting:

In the face of substantial evidence that Percy Levar Walton does not understand that his execution will mean his death, defined as the end of his physical life, the majority opinion and Judge Williams' concurrence take the position that an individual may be found competent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), without such an understanding.[1] Notably absent from the majority opinion is any explanation for this holding other than "*Ford* doesn't

---

[1] Judge Williams' concurrence suggests that I wish to "prevent Virginia from executing Walton." Ante, at 28. Lest any reader be confused by the concurrence's remark, it is worth emphasizing that I would *only* remand for a single factual finding by the district court and that on appeal this finding would be reviewed under the highly deferential "clear error" standard. In the event that it is determined that Walton understands what "to die" means, his execution would proceed.

While the majority and I are divided with respect to what the Eighth Amendment requires here, I have no doubt that we—as well as the State—share a firm conviction that no individual should be put to death in violation of the Constitution.

say it." With respect to the purely legal question of what the Eighth Amendment requires for competency to be executed, I would hold that an individual's understanding of the fact of execution must include at least a rudimentary comprehension that execution will mean his death, defined as the end of his physical life.

There is nothing new about my position. There is no dispute that the Constitution prohibits the imposition of capital punishment unless the inmate understands that he is going to be executed and that to be executed means to die. *See* ante, at 21-22. Contrary to what my colleagues assert, this is not a rewriting of *Ford*. It is a simple recognition that the constitutional question ("Do you understand that your execution will cause you to die?") cannot be meaningfully answered unless the condemned understands what "to die" means. In the ordinary case, an inmate who understands what execution and dying mean will also understand that execution will mean the end of his physical life. But there are no doubt some who, by reason of mental illness or defect, do not understand this despite being able to utter the proper incantation when prompted. When the record raises a legitimate question as to whether a condemned inmate understands what "to die" means, the district court is obliged to resolve that issue. This is precisely such a case, and the effect of today's holding is to permit the execution of a person who may be unaware that his physical life is going to end.

The majority opinion additionally states that even if such an understanding is required, "the record contains ample evidence . . . establishing that Walton understands that his execution will mean the end of his physical life." Ante, at 22 n.17. I do not dispute that there is evidence in this record that may support such a finding, just as the majority opinion does not dispute that there is ample evidence to support a contrary finding. (For example, the record indicates that Walton can recite, after prompting, that he is to be executed for murder. However, Walton has also stated that his execution will allow him to "have a telephone, a motorcycle, and a job at Burger King." J.A. 367 (internal quotation marks omitted).) This is *not* the point. The point is that the district court has *never* assessed the evidence as it relates to the specific question of whether Walton understands that his execution will mean the end of his physical life.

Because the Constitution, as a legal matter, requires that a condemned inmate understand that execution will result in the end of his physical life, and because there has never been a factual finding regarding whether this standard is met here, the Eighth Amendment demands that we vacate the judgment of the district court and remand for reconsideration of Walton's competence to be executed. A society that has unequivocally rejected the execution of the insane as "savage and inhuman," *Ford*, 477 U.S. at 406, can accept no less.[2] I therefore dissent.

## I.

There is no dispute here that Walton was properly convicted and sentenced to death for three brutal murders. Similarly, there is no dispute that since his sentencing, Walton has fallen deeper and deeper into mental illness. The issue before the en banc court concerns only the questions that must be answered by a court faced with the task of determining whether Walton is competent to be executed. While the majority and I agree that the test for competency under the Eighth Amendment is whether an individual understands that he is to be executed and why,[3] I would hold that an individual's understanding of the fact of execution must include the understanding that execution will mean his death, defined as the end of his physical life.

---

[2]Judge Williams' concurring opinion states (incorrectly) that I have rewritten *Ford* (or have crafted an interpretation that is "without basis" in *Ford*). Ante, at 29. Far from rewriting *Ford*, I am merely doing what I am constitutionally obligated to do: deciding whether competency under the Eighth Amendment includes the fundamental understanding that death means the end of physical life. To the extent *Ford* addresses this question, it supports my view. To the extent *Ford* does not address the question, I believe that the Eighth Amendment cannot require less than a rudimentary comprehension of the end result of execution.

[3]I agree with the majority opinion that the proper test for competency to be executed includes neither an ability to assist counsel, *see* ante, at 17, nor an ability to "prepare . . . mentally and spiritually for his passing," *id.* at 18-19.

A.

That a prisoner's awareness of his upcoming execution should include such a fundamental understanding is clear, first, from the manner in which the members of the *Ford* Court stated the constitutional prohibition on the execution of the insane. The plurality recognized society's abhorrence of inflicting the death penalty on one whose mental illness prevents him from "comprehending" the "implications" of his punishment. *Ford*, 477 U.S. at 417 (plurality opinion). There can be no doubt that the first and foremost "implication" of execution—and, in my view, the only one relevant to competency to be executed—is the prisoner's death.

Justice Powell, in concurrence, stated the constitutional rule as follows:

> If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

*Id.* at 422 (Powell, J., concurring in part and concurring in the judgment). Justice Powell's meaning in this passage is clear: the retributive goal of capital punishment is satisfied only if the prisoner understands that his execution will end his physical life. *Accord Martin v. Dugger*, 686 F. Supp. 1523, 1569 (S.D. Fla. 1988) ("An essential part of the punishment society imposes on a defendant is to make the defendant realize and live with the concept that he will die for what he did. . . . Accordingly, if retribution is to be served by the death of a condemned prisoner, the prisoner must at least have this realization.").

Similar language, indicating an appreciation that a prisoner's awareness of his execution must include the understanding that execution means the end of his physical life, is found in numerous federal and state court decisions before and after *Ford*. *See, e.g., Scott v.*

*Mitchell*, 250 F.3d 1011, 1013-14 (6th Cir. 2001) (holding that competency is appropriately defined as "the mental capacity to understand *the nature of the death penalty* and why it was imposed upon the convict" (emphasis added; internal quotation marks omitted); *Barnard v. Collins*, 13 F.3d 871, 876-77 (5th Cir. 1994) (denying certificate of probable cause based on state court finding that petitioner "comprehend[ed] the *nature . . . of his execution*" (internal quotation marks omitted)); *Amaya-Ruiz v. Stewart*, 136 F. Supp. 2d 1014, 1018 (D. Ariz. 2001) (noting that Arizona defines competency to be executed in terms of the prisoner's awareness that the punishment for murder is death); *State v. Perry*, 502 So. 2d 543, 564 (La. 1986) (holding that Louisiana will not execute an individual who "lacks the capacity to understand the death penalty"); *Billiot v. State*, 655 So. 2d 1, 15-16 (Miss. 1995) (holding that to be competent under *Ford*, a prisoner must "have a rational understanding of what it means to be executed"); *Grammer v. Fenton (In re Grammer)*, 178 N.W. 624, 626 (Neb. 1920) (holding that demonstrating incompetence to be executed requires a showing that the petitioner "does not understand, and is incapable of understanding, . . . *his impending fate*" (emphasis added)); *State v. Scott*, 748 N.E.2d 11, 13 (Ohio 2001) (per curiam) (observing that Ohio defines competency under *Ford* as "the mental capacity to understand *the nature of the death penalty* and why it was imposed upon the convict" (emphasis added; internal quotation marks omitted)); *Bingham v. State*, 169 P.2d 311, 315 (Okla. Crim. App. 1946) (stating that purpose of competency examination prior to execution is to determine "whether it would be consistent with public decency and propriety to take away the life of a person *who was not sane enough to realize what was being done*" (emphasis added)); *Commonwealth v. Jermyn*, 652 A.2d 821, 823-24 (Pa. 1995) (affirming lower court conclusion that the petitioner was competent to be executed because, *inter alia*, his mental illness did not preclude him from understanding the "implications" of the death penalty); *see also Solesbee v. Balkcom*, 339 U.S. 9, 20 n.3 (1950) (Frankfurter, J., dissenting) (stating that "[a]fter sentence of death, the test of insanity is whether the prisoner" can "understand," *inter alia*, "the impending fate which awaits him" (internal quotation marks omitted)).

Indeed, the prisoner's ability *vel non* to comprehend that execution means the end of his physical life was the deciding factor in two post-*Ford* competency cases. In *Singleton v. State*, 437 S.E.2d 53, 58 (S.C.

1993), the court concluded that the petitioner, Singleton, was incompetent to be executed because he did not understand "the nature of the punishment":

> Singleton is completely unaware that he is capable of dying in the electric chair. His reliance on protective "genes" and his inability to respond to his counsel's questions with anything other than a yes-no are indicative of Singleton's failure to understand either the reason or the nature of his punishment.

*Accord Musselwhite v. State*, 60 So. 2d 807, 809 (Miss. 1952) (holding that petitioner was incompetent to be executed because his catatonic schizophrenia rendered him unable to "take account of [the] significance" of being "taken to the electric chair"). In contrast, the Fifth Circuit in *Garrett v. Collins*, 951 F.2d 57, 58-59 (5th Cir. 1992) (per curiam), concluded that the petitioner was competent to be executed even though he believed that his deceased aunt would protect him from the toxic effects of the chemicals used during lethal injection. The court reasoned that the petitioner "comprehend[ed] the nature of the penalty," *id.* at 59 (internal quotation marks omitted), because although he believed he *would not* die, he recognized that the purpose of the execution was to end his life.

The majority opinion contends that these cases stand only for the "unremarkable proposition . . . that the condemned inmate must understand that he will die as punishment for his crimes." Ante, at 22. Judge Williams' concurrence makes the same claim. I cannot agree. The language of these cases makes it abundantly clear that the test for competency simply is not so narrow. Moreover, neither the majority opinion nor Judge Williams' concurrence can seriously dispute that the courts in *Singleton* and *Garrett* examined *precisely* the question at issue here—whether the inmate must understand that execution will mean the end of his physical life—in deciding competency.

Indeed, today's holding is "consistent with *Garrett*," ante, at 22 n.18, only insofar as the majority opinion, like the court in *Garrett*, would affirm the finding of competence. Otherwise, the majority opinion fails to appreciate the significance of the analysis and decision in that case. In finding Garrett competent even though he

believed that he *would not* die, the Fifth Circuit explicitly rejected counsel's contention that Garrett was incompetent because he was not "fully aware of the consequences of the death penalty." *Garrett*, 951 F.2d at 58. Importantly, the court concluded that Garrett was competent because he *actually understood* that his execution could cause him to "suffer death." *id.* at 59 (internal quotation marks omitted). *Garrett* thus addressed precisely the question that has *never* been addressed by the district court in this case.

The rarity of the particular circumstances of this case—in which the inmate is able to state that he is to be executed, but may not understand that to be executed means the end of his physical life—provides no basis for the conclusion of the majority opinion that the existence of such an understanding is not a critical component of competency to be executed.

Judge Williams' concurrence asserts that any inquiry into whether a condemned inmate understands that death means the end of physical life is improper because it is not mandated by the states through legislation. I would not have thought, however, that it would occur to the states to legislate something as obvious as prohibiting an execution when an inmate is so insane that he cannot comprehend the meaning of the statement "I am going to die." Surely, even the absence of legislation would not force this court to allow the execution of an individual who believed that "to die" meant "to go get an ice cream cone." Moreover, while objective evidence in the form of legislation is certainly relevant in identifying prevailing Eighth Amendment standards, the Supreme Court has made it abundantly clear that in the final analysis, the federal courts must render their own judgment regarding constitutional limitations on execution. *See Atkins v. Virginia*, 536 U.S. 304, 312-13 (2002).

In short, I would hold that, implicit in the rule that the Eighth Amendment forbids the execution of one who does not understand that he is to be executed, is the corresponding requirement that the condemned prisoner must understand that to be executed means to have one's physical life ended.

### B.

Judge Williams' concurring opinion criticizes my framing of the necessary Eighth Amendment inquiry as "purely scientific." Ante, at

30. However, the inquiry is phrased in "scientific" terms because the Eighth Amendment is concerned only with the inmate's ability to understand the physical reality of what will happen to him during execution. Execution is a punishment wrought upon the body; in executing a condemned inmate, the state is concerned solely with bringing about physical death, not with inflicting any punishment that may carry over into the afterlife. One who believes that the end of his physical life is not cause for concern, for whatever reason, may not fear death—indeed, he may even welcome it—and this would be no concern of the Eighth Amendment. An inmate is not incompetent to be executed simply because he "understand[s] death" in other than wholly physical terms, ante, at 30. What the Eighth Amendment is concerned with is a condemned inmate's ability to grasp the concept that execution will cause his heart to stop beating and his brain activity to cease.

The insistence of the concurrence that "the dissent's test requires an inquiry into condemned inmates' religious, poetic, or metaphysical views of death and the afterlife," ante, at 31, rests on its conflation of the understanding of the physical reality of death (what the Eighth Amendment requires) with the fact that many people attach to death a meaning that goes beyond the mere cessation of the heartbeat. The two are different questions—as is evident from the concurrence's own discussion, which is concerned solely with what different groups (if a fictional character who is admittedly dead can be considered a "group") believe about events after "the end of *this* physical life," ante, at 41, and the latter is entirely beside the point. It should be crystal clear that this case is *not* about the orientation of Walton's *Weltanshauung*; it is *not* about anyone's religious or philosophical views about the afterlife or absence thereof; it is *not* about the "meaning of death" at all. It is about whether Walton understands that his execution will mean the end of his physical life (or, if the concurrence would prefer, *this* physical life), regardless of whether he can or does ascribe any meaning to that event.

Further, Judge Williams' concurrence maintains that my view that Walton may not understand that his execution will result in his physical death is based on Walton's view of the afterlife. In support of this contention, the concurrence relies on my citation to several passages in the record indicating that Walton believes that his physical life will

continue after his execution. *See* ante, at 31. However, I cite these passages not as evidence of Walton's religious or metaphysical views regarding the meaning of his death, but rather as evidence that Walton may view death as merely a brief interruption of his current physical life. In other words, these passages indicate that Walton may not understand that death is an end to his physical life. The district court may determine that the concurrence's view of these passages is correct, and that Walton's statements reflect his metaphysical ideas about life after death. But, these statements are also reasonably susceptible to the inference that Walton does not understand the physical reality of death. We, as an appellate court, are not in a position to resolve this factual question; this is precisely why remand is required.

## II.

In my view, the evidence in the record presents a substantial question (one yet to be answered by the district court) as to whether Walton understands that his execution will mean his death, *i.e.*, the end of his physical life. The existence of a substantial question is a sufficient basis for a remand to the district court for factual findings concerning this particular question. *See Coe v. Bell*, 209 F.3d 815, 821 (6th Cir. 2000). To hold otherwise is to send Walton to his execution even though he may be too mentally ill to comprehend what is happening.

Psychiatrist Patricia General, who examined Walton on two occasions in April and May 2003, concluded that Walton was "floridly psychotic" and "had no insight into what was going on around him." J.A. 304-05 (internal quotation marks omitted). Dr. General further noted that Walton did not "seem to be concerned with his upcoming execution date." *Id.* at 307. During the May meeting, Walton had stated that he was going to be executed. Dr. General testified:

> I presume that what I had asked him about was, was he aware that he was going to be executed, and he said he was going to be executed. *I further asked him if he knows what that means? And he replied, "No."* So I further explained that it meant that he would be put to death, and he said, "Yes." And . . . when I asked him if he knew why he would

be put to death, . . . he said . . . some people had told him
. . . that he had killed some people.

*Id.* at 311-12 (emphasis added).[4] On cross examination, Dr. General
responded to the question "is it your impression that [Walton] under-
stood that he would be put to death?" by saying, "Yes, after further
questioning" and that "[w]ith the questions" Walton "understood he
would be put to death." *Id.* at 344. On redirect, Dr. General agreed
with Walton's counsel that Walton did not understand what execution
meant until she explained it to him.

Dr. General's testimony that Walton had to have the meaning of
the term "execution" explained to him is consistent with the observa-
tions of psychiatrist Anand Pandurangi, who testified that Walton's
understanding of the proceedings concerning his upcoming execution
was extremely limited. Regarding Walton's present cognitive ability,
Dr. Pandurangi said that Walton could not understand the nature of
the *Ford* hearing, "with the caveat [that] you can teach him that. . . .
[Y]ou can hammer it in . . . for a short period. Now, 15 minutes later,
it's gone." *Id.* at 380. Dr. Pandurangi stated that Walton could not
comprehend the fact that execution would mean his death "[i]n any
sustained sort of way." *Id.* at 381; *see id.* at 422 ("[H]e's not able to
understand this, or keep it in his mind in any sustained way over some
period of time, including . . . only 90 minutes."). Similarly, at the
March 2004 *Ford* hearing, Dr. Pandurangi estimated that Walton had
the understanding of a six- or eight-year-old but that he was capable
of a brief factual understanding of execution: "[I]f you give it to him
or if you press it, he can register, and for that moment, fleeting, he
can hold it. If I tell him, 'You've been given the death sentence,' he
will say, 'The death sentence.' He registers it. . . . But when it comes
to the implications of that, any further discussion of it, there I don't
think he understands that." *Id.* at 975-76. Dr. Pandurangi concluded,
"I would say [Walton] does not have the ability to prepare himself in
any meaningful [way] . . . . [He's] not thinking of death and prepara-
tion for death that way. He seems to be thinking like he can ride a
motorcycle, or somebody will come see him . . . ." *Id.* at 978.

---

[4]After expressing her concerns regarding Walton's mental state, Dr.
General was removed from her duties on death row.

Dr. Pandurangi also testified regarding Walton's conception of death. Among other things, Dr. Pandurangi noted that as far back as 1997, Walton insisted that he wanted "to plead guilty and get the [electric] chair" so that he could "come back to life and be with his honeys." *Id.* at 410 (internal quotation marks omitted). Based on his discussions with Walton, who "indicated that by getting the chair, he would be a man," Dr. Pandurangi opined that Walton "thinks that somehow electrocution is . . . going to make him more powerful or make him come back to life or something stronger." *Id.* at 411 (internal quotation marks omitted). During his interview with Dr. Pandurangi, Walton indicated that he might have "special powers" that would allow him to come back to life after execution, although he was not unalterably fixed on this idea. *Id.* at 365 (internal quotation marks omitted). And, Dr. Pandurangi testified that Walton had "some delusional type of thinking in his mind" regarding death, in that he simultaneously acknowledged the imminence of the death penalty while nevertheless stating that he wanted to "look good . . . [i]n the shopping mall" and thought that he could have a telephone, a motorcycle, and a job at Burger King. *Id.* at 366-67 (internal quotation marks omitted). According to Dr. Pandurangi, Walton thought "both things are possible at the same time," leading Dr. Pandurangi to conclude that Walton viewed death as "a very temporary thing." *Id.* at 366.

At the March 2004 *Ford* hearing, Dr. Pandurangi testified regarding his recent observations of Walton. At that time, Dr. Pandurangi found that Walton could not consistently state why he was in prison (*e.g.*, "[Walton] did say, 'They found me guilty, three people.' And then he sort of added quickly, 'I don't know guilty or not.'" *Id.* at 961). Walton was unable to explain what execution was or what happened at death, other than to say "Sleep for rest of life . . . until someone comes to see you." *Id.* at 964 (internal quotation marks omitted).

The testimony of Dr. Ruben Gur, who examined Walton in July 1999 and again on May 5 and 6, 2003, also indicates that Walton may not understand that execution means the end of his physical life:

> [W]hen I asked [Walton] whether he could tell me where he stands now . . . his impression was that he's about to have

his hearing, that there have been allegations that he's killed some people . . .

I told him, "Well, that's not what I'm told. My understanding is that you had the trial and that you were convicted, and that you were sentenced to death." And that's when he gives you, "I don't know. I don't even know."

I tried to push further on both visits and explain to him in as graphic terms as I could what it meant, and I asked him if he could repeat after me, and he said, "Yes." And I asked him to do that, and he said, "I'm going to be executed."

And I said, "That's right. And do you understand what happens when you get executed?"

And he said, "I don't know."

I said, "Well, you die."

He says, "Yes, I die."

"Do you understand what it means that you die?"

And he says, "Yes."

And I said, "Well, what does it mean?"

He says, "It means you're dead."

I said, "That's right. . . . What's going to happen then?"

. . . .

And he said, "After execution, I'm going to get a Burger King."

J.A. 440-41. Dr. Gur further testified that while Walton could state his execution date as May 23, 2003, he did not know what year it actually

was. Dr. Gur also stated that Walton cannot comprehend "the ramifications of what may occur if he's executed": "I think you could explain it to him and he will be able to parrot statements that you feed him, but you come back ten minutes later and see that there isn't much left out of all that effort." *Id.* at 455-56. And, while Dr. Gur acknowledged that Walton "understands that . . . he will die," he questioned whether Walton "understands death," noting that his primary concern was that he could "come back as a woman." *Id.* at 459.

Walton's testimony during the July 2003 *Ford* hearing also indicates that Walton may not understand that his execution will result in his physical death. For example, Walton answered "I don't know. I don't even know" when asked what his execution date meant, and "I don't think so" when asked "If you have an execution date, does that mean that you have been sentenced to death?" *Id.* at 506-07. Walton was also unable to say what would happen to him "[i]f your sentence of death was going to be carried out, if you were going to be executed." *Id.* at 507. When asked "If you were executed, could you come back to earth? Could you be back in prison? Could you be out?" Walton responded, "I don't know. I don't know. I don't know how the procedure goes. . . . I don't know if I could be back in prison or not." *Id.* at 509. Nor could Walton state why he had been sentenced to death. After hearing Walton's testimony on direct examination, the district court stated, "[O]bviously if the Court credits his testimony, he's not competent." *Id.* at 512. Despite this statement, the district court did not discuss Walton's credibility in its decision finding Walton competent to be executed.

To be sure, some of Walton's testimony indicated that he may understand that his execution will mean his death. For example, Walton stated that during lethal injection "they stick a needle in your arm or something," and he then agreed with the State's suggestion that "[y]ou die" at that point. *Id.* at 522-23. However, during this same cross-examination Walton was unable to answer questions about what electrocution is, responding "I don't know" or "I don't even know." *Id.* at 523-24.

The expert appointed by the court, psychiatrist Mark Mills, was directed to examine Walton regarding "(1) whether Walton understands that he is to be punished by execution; and (2) whether Walton

understands why he is being punished." *Id.* at 869; the district court specifically restricted Dr. Mills to these questions only. Based on his examination of Walton, Dr. Mills answered "yes" to both of those questions. *Id.* at 897-99. Walton told Dr. Mills that it did not matter how he was executed (electrocution or lethal injection); when Dr. Mills asked why, "He said something like it's an end, or it's the end." *Id.* at 899. Dr. Mills described Walton's understanding of death as "simple, maybe even childlike. I believe that there's enough there that he understands things are going to be very different than they are now." *Id.* at 902. Dr. Mills ultimately concluded that "the standard for execution is sufficiently low that, sadly, Mr. Walton meets that standard. *He knows enough to meet the judge's questions to him.*" *Id.* (emphasis added). Dr. Mills acknowledged, however, that Walton had previously been unable to articulate his understanding of execution and noted, "I think I may have caught him on a good day." *Id.* at 947-48. Dr. Mills also stated that he might have "pushed" more on some questions if he had had the reports of other doctors at the time of his examination. *Id.* at 924. Ultimately, the most Dr. Mills could say was that Walton appeared to meet the criteria articulated by the district court on the day that Dr. Mills examined him. In short, Dr. Mills' assessment of Walton's competency does not present the unequivocal certainty that the majority opinion claims for it.

In my view, the conflicting evidence before the district court regarding Walton's ability to understand that his execution will result in the end of his physical life obliged the court to consider that question specifically in ruling on Walton's competency to be executed. The court did not do so, however. The opinion of the district court reveals that it only considered the narrow question of whether Walton knew that he was to be punished by execution for the murders of three people. Although the court noted Dr. Mills' testimony that "Walton recognized that his execution was 'the end' or 'an end,'" *Walton v. Johnson*, 306 F. Supp. 2d 597, 601 (E.D. Va. 2004), the court did not specifically inquire into whether the "end" to which Walton referred was the end of his physical life. Given the substantial conflict in the evidence regarding whether Walton understands that his execution will mean his death, I believe it was incumbent upon the district court to make specific finding on this question.

I would not at this point hold that Walton is actually incompetent under *Ford*. My concern, rather, is with the narrowness of the inquiry made by the district court and the substantial possibility that Walton does not know that his execution will mean the end of his physical life. I respectfully dissent.[5]

Judges Michael, Motz, Traxler, King, and Gregory join in this dissenting opinion.

---

[5]For the reasons set forth in Judge Motz's opinion for the panel, *see Walton v. Johnson*, 407 F.3d 285, 294-97 (4th Cir. 2005), I would remand for further consideration of Walton's claim that he cannot be executed because he is mentally retarded, *see Atkins v. Virginia*, 536 U.S. 304, 321 (2002).